No. 18-1855/18-1871

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

GARY B.; JESSIE K., a minor, by Yvette K., guardian ad litem;
CRISTOPHER R., a minor, by Escarle R., guardian ad litem; ISAIAS
R., a minor, by Escarle R., guardian ad litem; ESMERALDA V., a
minor, by Laura V., guardian ad litem; PAUL M.; JAIME R., a minor,
by Karen R., guardian ad litem,

       Plaintiffs-Appellants,

v.

GRETCHEN WHITMER, Governor; TOM MCMILLIN, member of MI
Bd of Education; MICHELLE FECTEAU, member of the MI Bd of
Education; LUPE RAMOS-MONTIGNY, member of the MI Bd of
Education; PAMELA PUGH, member of the MI Bd of Education;
JUDITH PRITCHETT, member of the MI Bd of Education; CASANDRA
E. ULBRICH, member of the MI Bd of Education; NIKKI SNYDER,
member of the MI Bd of Education; TIFFANY TILLEY member of the
MI Bd of Education; SHEILA ALLES, Interim Superintendent of Public
Instruction for the State of MI; TRICIA L. FOSTER, Director of the MI
Dept of Technology; WILLIAM PEARSON, State School
Reform/Redesign Officer, in their official capacities,

       Defendants-Appellees.

Appeal from the United States District Court
Eastern District of Michigan, Southern Division
Honorable Stephen J. Murphy, III

**PETITION FOR REHEARING EN BANC**

## PETITION FOR REHEARING EN BANC

B. Eric Restuccia (P49550)
Deputy Solicitor General
Counsel of Record

Raymond O. Howd (P37681)
Travis Comstock (P72025)
Elizabeth Husa Briggs (P73907)
Assistant Attorneys General
Attorneys for Defendants
Tom McMillin and Nikki Snyder
Department of Attorney General
P.O. Box 30212
Lansing, Michigan 48909
(734) 417-1583
Restucciae@michigan.gov
HowdR@michigan.gov
ComstockT@michigan.gov
BriggsE1@michigan.gov

Dated:  May 6, 2020

# TABLE OF CONTENTS

Page

Table of Authorities ..................................................................................ii

Statement In Support of  Petition For Rehearing En Banc .....................1

Facts and Proceedings ..............................................................................4

    A.    The State of Michigan's Role in Public Education ................5

    B.    The Long-Term Struggle of the Detroit Public Schools .........7

    C.    The State's Effort to Assist the Detroit Schools ....................8

Argument for Rehearing En Banc .........................................................11

I.    Under the U.S. Constitution, education is not a fundamental right as a matter of substantive due process.................................11

    A.    The U.S. Supreme Court has never found education to be a fundamental right and its precedent does not support the panel majority's decision here...........................12

    B.    The decision here conflicts with the Supreme Court on affirmative rights and provides no real standards..............16

II.    The U.S. Constitution entrusts education to the States and their local school districts. ..........................................................18

Certificate of Compliance ....................................................................21

Certificate of Service ...........................................................................22

# TABLE OF AUTHORITIES

<u>Page</u>

**Cases**

*Brown v. Bd of Ed,*
347 U.S. 483 (1954) ....................................................................... 12, 16

*Coalition to Defend Affirmative Action v. Regents of the University of Michigan,*
701 F.3d 466 (6th Cir. 2012) ................................................................. 1

*DeShaney v. Winnebago Cty.,*
489 U.S. 189 (1989) ........................................................................ 1, 15

*Durant v. State Bd. of Ed.,*
381 N.W.2d 662 (Mich. 1985) ................................................................ 6

*Fry v. Napoleon Cmty. Schs.,*
788 F.3d 622 (6th Cir. 2015) ............................................................... 17

*Gary S. v. Manchester School District,*
374 F.3d 15 (1st Cir. 2004) ................................................................. 14

*Grinter v. Knight,*
532 F.3d 567 (6th Cir. 2008) ............................................................... 16

*In re City of Detroit,*
841 F.3d 684 (6th Cir. 2016) ............................................................... 16

*Kadrmas v. Dickinson Pub. Sch.,*
487 U.S. 450 (1988) ........................................................................ 12, 14

*L.M. v. State,*
862 N.W.2d 246 (Mich. Ct. App. 2014) ..................................................... 6

*Milliken v. Bradley,*
418 U.S. 717 (1974) ........................................................................... 18

*Papasan v. Allain,*
478 U.S. 265 (1986) ........................................................................ 12, 14

*Schuette v. Coalition to Defend Affirmative Action,*
  572 U.S. 291 (2014) ................................................................ 2

*Strickland v. Washington,*
  466 U.S. 668 (1984) .............................................................. 17

*Washington v. Glucksberg,*
  521 U.S. 702 (1997) .............................................................. 16

*Widdoes v. Detroit Pub. Sch.,*
  553 N.W.2d 688 (1996) .......................................................... 6

**Statutes**

1990 Mich. Pub. Acts 72 .............................................................. 9

1999 Mich. Pub. Acts 10 .............................................................. 8

2009 Mich. Pub. Acts 204 ............................................................ 9

2016 Mich. Pub. Acts 192 ........................................................... 10

2016 Mich. Pub. Acts 193 ........................................................... 10

Mich. Comp. Laws § 380.11a(3) ................................................. 18

Mich. Comp. Laws § 380.1282(1) ................................................. 8

Mich. Comp. Laws § 380.410(2) ................................................... 9

Mich. Comp. Laws § 380.601a(1)(a) ............................................. 8

Mich. Comp. Laws § 388.1009........................................................ 5

Mich. Comp. Laws §§ 380.11a(3)(a) ............................................. 8

Mich. Comp. Laws §§ 380.371-380.376 ....................................... 9

**Other Authorities**

Mich. Const. Art 8, § 2........................................................... 6, 18

**Rules**

6 Cir. I.O.P. 35(e)..............................................................................2

Fed. R. App. P. 35(a)(1) ...............................................................16

Fed. R. App. P. 35(a)(2) ...............................................................16

Fed. R. App. P. 35(b)(1)(A) .............................................................1

Fed. R. App. P. 35(b)(1)(B) .............................................................1

Fed. R. App. Pro. 35(b) ...................................................................2

## STATEMENT IN SUPPORT OF
## PETITION FOR REHEARING EN BANC

This case presents the paradigm of cases that merit review by the full panel of judges within the circuit en banc.  The issue whether the U.S. Constitution provides a fundamental right to a basic minimum education is a question of exceptional importance.  *See* Fed. R. App. P. 35(b)(1)(B).  The panel majority recognized as much.  Slip op., p. 60 ("The recognition of a fundamental right is no small matter.").  The dissent did as well.  *Id.* at 64 ("[T]he plaintiffs seek an unprecedented subsidy for an unprecedented right.").  And, agreeing with the analysis of the dissent, this petition contends that the panel majority's decision also conflicts with decisions of the U.S. Supreme Court.  Slip op., p. 76 ("*DeShaney* [*v. Winnebago Cty.,* 489 U.S. 189 (1989)] cannot stand" under the panel majority's analysis).  *See* Fed. R. App. P. 35(b)(1)(A).

This case stands in a small category of precedents – appearing once every so many years – that merit this Court's review en banc.  *See, e.g., Coalition to Defend Affirmative Action v. Regents of the University of Michigan,* 701 F.3d 466 (6th Cir. 2012) (en banc) (affirmative action), reversed *Schuette v. Coalition to Defend Affirmative Action*, 572 U.S. 291 (2014).  This Court should rehear this case en banc.

1

Consistent with their opening brief, the State defendants Tom McMillin and Nikki Snyder ask this Court to rehear this case, reject the panel majority's central legal conclusion finding a fundamental right, and allow the matter to return to whom these critical issues have been principally entrusted under Michigan law, the Detroit Board of Education and its Superintendent.[1]  As elected members of the State Board of Education named in their official capacities, both McMillin and Snyder are committed to ensuring that children in Michigan have a meaningful opportunity to learn.  But it is for the State and its local school board to address these educational issues, not the federal judiciary.  And since 2016, there have been strides made toward improving the Detroit schools.

---

[1] While the panel majority opinion questions the ability of defendants McMillin and Snyder to support the district court's opinion, *see* slip op., p. 16 n.7, the federal appellate rules expressly allow "a party" to file a petition for rehearing en banc.  *See* Fed. R. App. P. 35(b) ("A party may petition for a hearing or rehearing en banc.").  In fact, this Court could elect to rehear this case en banc even without these defendants' request based on its internal operating procedures.  6 Cir. I.O.P. 35(e) ("any member of the en banc court may sua sponte request a poll for hearing or rehearing en banc before a party files an en banc petition.").

Moreover, the attorneys for the State defendants McMillin and Snyder note that the Department of Attorney General has established a conflict wall in its office, allowing for other attorneys within the Department to represent the remaining State defendants, including the Governor.

The petition asks this Court to review the panel majority's ruling that there is a fundamental right to a minimum education – providing access to literacy – based on substantive due process for two reasons.

*First*, as persuasively outlined by the dissent, this decision conflicts with the U.S. Supreme Court precedent, in reviewing the text, design, and historical understanding of the U.S. Constitution.  By creating a new, affirmative right to access literacy, the decision radically alters the federal role in local education.  It stands untethered to any real standards or benchmarks, where the federal judiciary has no special competence to govern local schools.  While every student should have an opportunity for a meaningful education, the same is true for housing, food, medical care, and adequate police protection.  All good things.  But the Constitution has never required these services as these are matters of state governance, not affirmative rights.

*Second*, and equally important, the decision here effectively displaces the role of the State and its local school boards in favor of the federal judiciary.  The gravamen of the complaint here is really about resources, and the plaintiffs' frustration at the perceived lack of legislative funding to support a financially distressed school district.

To be sure, the problems of the City of Detroit schools identified here, like some other schools in Michigan, are profound.  Yet, the responsibility to solve these problems rests with the people of Michigan through their elected representatives and their local school boards.  The Constitution has not displaced them in favor of the federal courts.

## FACTS AND PROCEEDINGS

The 129-page complaint and the panel majority lay out a grim picture of five of the poorest performing schools from the City of Detroit. This petition does not seek to minimize or diminish the magnitude of these problems, which are reflected in the conditions of the schools, *see* slip op., pp. 7–11, and the educational outcomes for these schools, *id.* at 11–13.  But in the view of this petition, the questions are (1) how does the U.S. Constitution expect these problems to be addressed, and (2) by whom.  The answers to these questions rest on foundational principles about the nature of our constitutional democracy and the role that the State and its local school districts play in the governing of education. This Court should rehear this matter to resolve these questions.

## A.    The State of Michigan's Role in Public Education

As an initial matter, it is important to recognize that education is primarily a local matter in Michigan, with the State Board of Education itself providing general supervision.  Mich. Const. art. VIII, § 3 ("Leadership and general supervision over all public education . . . is vested in a state board of education.  It shall serve as the general planning and coordinating body for all public education . . . and shall advise the legislature as to the financial requirements in connection therewith.").  *See also* Mich. Comp. Laws § 388.1009.

In 1994, the Michigan Legislature significantly altered the funding mechanisms for per pupil spending for school districts, relying primarily on an increase in the sales tax, creating a funding floor for all districts known as the "foundational allowance."  *See Durant v. Dep't of Ed.*, 605 N.W.2d 66, 73 (Mich. Ct. App. 2012) (guaranteed by art. IX, § 11).  As set by the Legislature, the foundational allowance for the City of Detroit public schools for 2019-20 was $8,142, where the majority of districts receive $8,111 per pupil.[2]

---

[2] *See* https://www.michigan.gov/documents/cyfound_11728_7.pdf (Last accessed May 4, 2020).

Other than the legislative funding and the supervision provided by the State Board of Education and the Michigan Department of Education, the Michigan Court of Appeals has explained that the State's role in education "is neither as direct nor as encompassing" as claimed by those who challenged the level of educational services in the Highland Park City schools. *L.M. v. State*, 862 N.W.2d 246, 252–53 (Mich. Ct. App. 2014) (plaintiffs were claiming a "failure to obtain basic literacy skills and reading proficiency as required by the state"). Michigan's constitution only requires the Legislature to "maintain and support a system of free public elementary and secondary schools, as defined by the law," with a local school district having the responsibility to "provide for the education of its pupils[.]" *Id.* (quoting Mich. Const. art. VIII, § 2.)

"Local control of education is a time-honored tradition in this state[.]" *Durant v. State Bd. of Ed.*, 381 N.W.2d 662, 670 (Mich. 1985). Local autonomy has long been understood as essential both to maintain community concern and support for public schools, and to the quality of the educational process. *Widdoes v. Detroit Pub. Sch.*, 553 N.W.2d 688, 690–91 (Mich. Ct. App. 1996) (collecting cases).

6

## B.    The Long-Term Struggle of the Detroit Public Schools

The history of financial and academic decline of the Detroit public schools predates 1999.  (Complaint, R.1, ¶68, PageID#50.)  The Detroit public schools ran deficits in 11 of the 15 fiscal years between 1972 and 1988, by which time it had a $103 million deficit.  The last surplus balance the Detroit public schools reported was $1.5 million, which occurred in the 1977-78 school year.  (Select Panel 1988 Rpt., R.60-5, PageID#573.)

Likewise, the enrollment in the Detroit public schools followed a similar trajectory, declining by 13.2 % between 1981 and 1988.  (*Id*. at 596.)  The enrollment then plummeted in the 2000s, from 156,182 students in 2002 to 45,139 in 2016.  "DPSCD Enrollment Plan," 2018-20, p. 4.[3]  The enrollment declines from 2003 to 2007 alone resulted in a reduction in total per-pupil state aid of $70.3 million on average per year.  (Council of Great City Schools 2008 Rpt., R.60-6, PageID#837.)

---

[3] Available at the following address:
https://www.detroitk12.org/cms/lib/MI50000060/Centricity/domain/4036/enrollment/DPSCD%20Enrollment%20Plan%20-board%20approved%20June%202018.pdf (Last accessed May 1, 2020)

At the same time, even by 1999 the City's schools had some of the highest drop-out rates and lowest performing test rates in the State.[4] Consistent with the dramatic decline in the City's population, the loss of enrollment substantially contributed to the loss of revenue and deteriorating conditions of the schools.

## C.    The State's Effort to Assist the Detroit Schools

As already noted, absent the State intervening to address severe financial or academic problems in a school district, Michigan has long recognized that local school boards are responsible for educating their pupils.  Mich. Comp. Laws §§ 380.11a(3)(a), 380.601a(1)(a), and 380.1282(1).  The State responded to the City's long-term decline of enrollment, and its corresponding loss of revenue, as well as its poor educational performance, by passing several legislative initiatives.

In 1999, in order to address the poor academic performance of the City's students, the Michigan Legislature created a school reform board to operate the District.  1999 Mich. Pub. Acts 10.  In that same year, the

---

[4]  *See* Senate Fiscal Analysis, which is available here:

https://www.legislature.mi.gov/(S(riebsaozzhhi1frm5f43vcez))/mileg.asp
x?page=getObject&objectName=1999-SB-0297 (Accessed May 3, 2020).

State enacted legislation to reorganize the Detroit Public Schools (DPS), eliminating the regional boards for a seven-member central Board, with six members appointed by the Mayor, and a chief executive officer. Mich. Comp. Laws. §§ 380.371 through 380.376 (now repealed). The law also provided that after five years the residents of Detroit Public School District (DPSD) could choose between two options for the Board's configuration and selection process. Mich. Comp. Laws § 380.410(2). In 2004, DPSD electors voted to restore local control with an 11-member board, seven elected by district and four at-large members.

In 2009, after four years of local control, the State intervened because of DPS's severe financial conditions. Governor Jennifer Granholm appointed the district's first emergency financial manager in 2009. The district was under the control of an emergency manager until 2016. Also in 2009, as part of a package of bills designed to qualify for federal grants, the Legislature enacted Public Act 204. This law required the State Superintendent of Instruction to publish an annual list of the lowest achieving 5% of the State's public schools, placing each public school on the list under the supervision of the State Reform Officer (SRO). These schools were known as "Priority Schools."

9

More recently, in 2016, the State created – and funded – a new school district to serve Detroit: the Detroit Public School Community District (DPSCD).  2016 Mich. Pub. Act 192, §12b; §§ 381-396.  The DPSD was divided into two entities:  the old district and the DPSCD, which now operates the schools.  The new district relieved Detroit schools of the burden of the old district's debt, while leaving the structure of the old district in place solely to pay off that debt.  *Id*.  At the same time, the Legislature appropriated a total of $617 million to help restructure the DPSCD, providing another $70 million per year to the DPSCD until at least 2027, 2016 Mich. Pub. Act 193, and an additional $150 million to improve facilities.  2016 Mich. Pub. Act 197.

Finally, in 2016, the emergency manager was removed, and, in November 2016, Detroit residents elected a new board of education, which assumed control on January 1, 2017.  The new school board hired a superintendent in April 2017.  On June 30, 2019, the SRO and Priority Schools were dissolved.  2018 Mich. Pub. Acts 601.

## ARGUMENT FOR REHEARING EN BANC

**I.    Under the U.S. Constitution, education is not a fundamental right as a matter of substantive due process.**

No one disputes the importance of education. For that reason, it is one of the central goods that government aspires to ensure that its citizens obtain, along with food, shelter, medical care, and safety. Tom McMillin and Nikki Snyder, as members of the Michigan State Board of Education, are dedicated to providing the children of Michigan with the opportunity to obtain a good education, consistent with their role as provided in Michigan law.

But the panel majority has taken an unprecedented step, one that wrests the governance of education from local and state authorities and makes it a federal constitutional right that is now the purview of the federal judiciary to oversee. No other circuit has done this. And for good reason. The decision provides no effective standard to measure whether a state fulfills this right. And it is unprecedented by making it an affirmative duty to provide. Other goods that are also vitally important – food, shelter, safety, and medical care – now stand in line to be found as fundamental. Such a shift diminishes the ability of the State – and its local authorities – to govern education.

11

A.    **The U.S. Supreme Court has never found education to be a fundamental right and its precedent does not support the panel majority's decision here.**

The universe of relevant cases – five as measured by the opinions here – either declined to find a fundamental right to education or reserved the question. *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 458 (1988); *Papasan v. Allain*, 478 U.S. 265, 284 (1986); *Plyler v. Doe*, 457 U.S. 202, 223 (1982); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973); *Brown v. Bd of Ed,* 347 U.S. 483, 493 (1954).

The panel majority and the dissent each provided competing analysis of these opinions. Compare slip op., pp. 36–41 with *id.* at 65–66. *Rodriguez* left open the narrowest of possible rights:

> The Court did not, however, foreclose the possibility "that *some identifiable quantum of education* is a constitutionally protected prerequisite to the meaningful exercise of either [the right to speak or the right to vote]." [*Rodriguez*, 411 U.S.], at 36[.] Given the absence of such radical denial of educational opportunity, it was concluded that the State's school financing scheme would be constitutional if it bore "some rational relationship to a legitimate state purpose."

*Papasan,* 478 U.S. at 283 (quoting *Rodriguez,* 411 U.S. at 36) (footnote omitted; emphasis added), *id.* at 285 ("this Court has not yet definitively settled the questions whether a minimally adequate education is a fundamental right").

12

But a closer examination of *Rodriguez* demonstrates that the reasoning of the panel majority here clashes in important ways with the Court's central analysis in *Rodriguez*. As an initial matter, *Rodriguez* counsels judicial modesty in areas that have historically been within the province of the State. *Rodriguez,* 411 U.S. at 32 ("the Constitution does not provide judicial remedies for every social and economic ill."). Otherwise, courts become "super-legislature[s]," taking a legislative role for which they lack "both authority and competence." *Id.* at 30–31 (internal citation omitted). That applies with full force here.

Moreover, the Court cautioned that "the importance of a service performed by the State does not determine whether it must be regarded as fundamental." *Id*. at 30. For that reason, the Court noted that even though public welfare assistance may be a gateway by which "essential food, clothing, housing, and medical care" were secured, it refused to apply strict scrutiny but rather applied traditional constitutional analysis for such decisions that involve economic and social policy. *Id*. at 32, n.72. Indeed, courts must refrain from creating "substantive constitutional rights in the name of guaranteeing equal protection of the laws." *Id*. at 33. Again, the same applies with equal force here.

13

Furthermore, because the U.S. Supreme Court noted a possible right to a basic minimum education to ensure the right to vote or the right to speak, *Rodriguez,* 411 U.S. at 36, the Complaint shoehorns its allegations into a claim regarding the importance of literacy for democracy. Comp. ¶34. But, as noted by the dissent, this merely repackages the same basic allegations rejected in *Rodriguez.* Slip op., p. 77 ("the plaintiffs seek to enforce the right to education that *Rodriguez* rejected simply by relabeling it").

It is also worth noting that the reservation whether there exists a fundamental right to a basic minimum education has long remained dormant. The last apparent reference to a "minimally adequate education" as a matter of substantive due process appeared in dissent, more than 30 years ago. *Kadrmas*, 487 U.S. at 466 n.1 (Marshall, J., dissenting) ("That question remains open today.").

Despite this narrow dictum, *see Papasan* and *Rodriguez,* no other circuit has found such a right over the last 30 years. The only circuit court decision that addressed "a minimally adequate education" dismissed the claim with a paucity of analysis in a footnote. *See Gary S. v. Manchester School District,* 374 F.3d 15, 22 n.4 (1st Cir. 2004)

14

("As appellants have failed to provide any precedential example of a court's actually having applied this particular mode of heightened scrutiny analysis, we decline to embark upon this path.").

This almost universal judicial reticence counsels against creating this right from the dicta in *Rodriguez*. And the dissent provides a second compelling explanation why this right cannot stand with established Supreme Court precedent – the analysis and decision in *DeShaney*. As the dissent states, "[t]he plaintiffs' claim all but requires us to overrule this caselaw [including *DeShaney*]." Slip op., p. 70.

The nature of personal security is analogous to education. Each is important. Each is one of the primary goals of state government, to protect its citizenry and provide its citizens an opportunity for a decent education. But the analysis in *DeShaney* explains the baseline of the Fourteenth Amendment protections, namely "as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." 489 U.S. at 195. The panel majority displaced this principle based on its viewpoint that "education is different." Slip op., p. 55. Never before has substantive due process been "unmoor[ed]" from this limitation. *See* slip op., p. 70 (Murphy, J., dissenting).

15

To the contrary, "the list of fundamental rights is short, and seldom expanded, *see Washington* [*v. Glucksberg*, 521 U.S. 702, 720 (1997)]." *In re City of Detroit*, 841 F.3d 684, 700 (6th Cir. 2016). The *Glucksberg* factors, *id.* at 720–21, do not support the discovery of this right more than 150 years after the 14th Amendment's ratification. This case merits rehearing. *See* Fed. R. App. P. 35(a)(1), (2).

## B.    The decision here conflicts with the Supreme Court on affirmative rights and provides no real standards.

Sensitive to this idea that it was creating an untethered right, the panel majority sought to place the decision within the framework of other affirmative rights, namely the right to an attorney and the right to marriage. Slip op., pp. 52–56. The fundamental difference between the right to basic minimum education and these other rights is telling.

For the right to marry, the comparison is inapposite. The State does not have to create this status. But once created, it cannot allow for a prejudiced application. That is the reason that *Brown* was resolved without finding a fundamental right. Kansas did not have any federal obligation to create a school system, but once it did, it could not engage in prejudice by providing an inferior one to its residents based on race.

For the right to an attorney, that affirmative guarantee is expressly provided by the U.S. Constitution's text.  U.S. Const. amend. VI ("to have the Assistance of Counsel for his defence").  Not so here.

And while the right to counsel confers a protection of a minimum level of effectiveness, *Strickland v. Washington,* 466 U.S. 668 (1984), the comparison should give this Court pause before creating a right to an effective education system.  It is in the federal judiciary's wheelhouse to evaluate an attorney's effectiveness, but the same is not true about education.  *Cf.  Fry v. Napoleon Cmty. Schs.*, 788 F.3d 622, 626 (6th Cir. 2015), rev'd on other grounds, 137 S. Ct. 743 (2017) (noting that the Individual with Disabilities Education Act's "exhaustion requirement was intended to prevent courts from acting as ersatz school administrators and making what should be expert determinations about the best way to educate disabled students.").

The panel majority also attempted to create limits, referring to this right as "narrow" in scope but explaining that it "cannot prescribe a specific educational outcome."  Slip op., pp. 56, 57.  Even so, the standard is described as "provid[ing] access to a foundational level of literacy."  *Id.*  But what that means remains undefined, as recognized

by the panel majority. *Id.* ("it would be difficult to define the exact limits of what constitutes a basic minimum education").

The reality of what this standard will become is evidenced by the plaintiffs' list of requests for remedies, which includes "universal screening for literacy problems," the creation of a "statewide accountability" system, and the provision of "compensatory and remedial education for all class members," developing an individualized plan to bring each student up to grade level[.] [R.1, PageID#131–32.]

Some of these proposals are good things. But whatever their merits, they will become mandates. And funding from what budget, COVID-19 spending, the Michigan State Police, or from state roads? What has been state policy is now a matter for the federal judiciary.

## II.    The U.S. Constitution entrusts education to the States and their local school districts.

The U.S. Supreme Court recognized that "[n]o single tradition in public education is more deeply rooted than local control over the operation of schools." *Milliken v. Bradley*, 418 U.S. 717, 741–42 (1974). Michigan's constitution guarantees the provision of a free public system of education. Mich. Const. art. VIII, § 2. The local school districts manage the operation of these schools. Mich. Comp. Laws § 380.11a(3).

18

But this longstanding principle of local control over education is swept aside by this ruling. For poor performing schools, for which there are dozens of districts similar to Detroit,[5] their governance may become the federal courts' dominion. It is a loss of sovereignty. And it comes when the Detroit schools have seen some promising signs of progress.[6]

Any suggestion that state officials or the Michigan Legislature have been indifferent to these profound problems is unfounded, as evidenced by the 1994 change in funding, the 1999 State initiatives, the 2009 emergency manager, and the more recent infusion of hundreds of millions of dollars in 2016. The decision here also undermines efforts to restore local control.[7] In the final analysis, the panel majority effectively displaces the City's new Superintendent who took office in 2017 by imposing a new kind of "emergency manager" on the Detroit schools, but this is a federal one, imposed with virtually no accountability to the people of Michigan or the residents of Detroit.

---

[5] *See* https://www.michigan.gov/documents/mde/2018-19_CSI_Schools_634739_7.pdf (Last accessed May 4, 2020).

[6] *See, e.g.,* WXYZ "Detroit Public Schools Community District sees test score improvements" (Aug. 29, 2019). (Last accessed May 4, 2020).

[7] The partnership district models are an example of this effort. *See* https://www.michigan.gov/documents/mde/Final_OPD_Comprehensive_Guide.2019.05.02_654285_7.pdf (Last accessed May 5, 2020.)

## RELIEF REQUESTED

The State defendants Tom McMillin and Nikki Snyder request

rehearing en banc.

Respectfully submitted,

*s/B. Eric Restuccia*
B. Eric Restuccia (P49550)
Deputy Solicitor General
Counsel of Record

Raymond O. Howd (P37681)
Travis Comstock (P72025)
Elizabeth Husa Briggs (P73907)
Assistant Attorneys General
Attorneys for Defendants
Tom McMillin and Nikki Snyder
Department of Attorney General
P.O. Box 30212
Lansing, Michigan 48909
(517) 335-7656
Restucciae@michigan.gov
HowdR@michigan.gov
ComstockT@michigan.gov
BriggsE1@michigan.gov

Dated:  May 6, 2020

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1.    This petition for rehearing en banc complies with the type-volume limitation of Federal Rule of Appellate Procedure 40(b) because, excluding the part of the document exempted by Federal Rule of Appellate Procedure 32(f), this brief contains no more than 3,900 words. This document contains 3,900 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2016 in 14-point Century Schoolbook.

*s/B. Eric Restuccia*
B. Eric Restuccia (P49550)
Deputy Solicitor General
Counsel of Record

Assistant Attorneys General
Attorney for Defendants
Tom McMillin and Nikki Snyder
Department of Attorney General
P.O. Box 30212
Lansing, Michigan 48909
(517) 335-7656
restucciae@michigan.gov

# CERTIFICATE OF SERVICE

I certify that on May 6, 2020, I electronically filed the foregoing

**Petition for Rehearing En Banc** with the Clerk of the Court using

the ECF Filing system, which will provide electronic copies to counsel of

record.

*s/B. Eric Restuccia*
B. Eric Restuccia (P49550)
Deputy Solicitor General
Counsel of Record

Assistant Attorney General
Attorney for Defendants
Tom McMillin and Nikki Snyder
Department of Attorney General
P.O. Box 30212
Lansing, Michigan 48909
(517) 335-7656
restucciae@michigan.gov